UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LATRICE BASS,<br><br>    Plaintiff,<br><br>    v.<br><br>NANCY BERRYHILL,<br>Acting Commissioner of Social Security<br><br>    Defendant. | Case No. 18-cv-04365-WHO<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT; REMANDING FOR FURTHER PROCEEDINGS**<br><br>Re: Dkt. Nos. 20, 23, 24 |

The parties have filed cross-motions for summary judgment in this Social Security appeal. Based upon my review of the parties' papers and the administrative record, I GRANT plaintiff Latrice Bass's motion, DENY defendant's motion, and remand for further proceedings consistent with this Order.

**BACKGROUND**

**I.     PROCEDURAL HISTORY**

On April 8, 2014, Latrice Bass filed an application for Social Security Disability Insurance under Title II of the Social Security Act ("SSA"), and on April 30, 2014, an application for Supplemental Security Income under Title XVI of the SSA. Administrative Record ("AR") 42, 273–274. She claimed an initial onset of disability of November 9, 2000, based on diabetes, sleep apnea, issues with short term memory, panic attacks, high blood pressure, insomnia, and blisters on her hands and feet due to diabetes. AR 96, 108.

Bass's claims were denied initially and then denied again upon reconsideration. AR 146-149, 151-156. She requested a hearing before an Administrative Law Judge ("ALJ") and a continued hearing was held on May 16, 2017, with Bass and her attorney appearing. AR 70, 234.

At the continued hearing, Bass amended her alleged onset disability date to November 9, 2010. AR 72, 73.

The ALJ issued an unfavorable decision on June 22, 2017. Bass filed this action for judicial review pursuant to 42 U.S.C. sections 405(g) and 1383(c)(3) on July 18, 2018. AR 54. Now pending before me are the parties' cross-motions for summary judgement.

## II. MEDICAL HISTORY

Bass claims that most of her impairments stem from several early life events. AR 489, 490. While initially raised by her mother, during elementary school Bass was removed from her mother's care due to neglect and lived with her grandparents for a number of years. AR 490, 663. Bass had difficulty understanding why she could not live with her mother, becoming emotionally distraught when intermittent visits with her mother ended and going so far as to intentionally injure herself so that they could stay together. AR 663, 667. During her childhood, she was sexually abused by several older family members. AR 489, 490, 602, 663, 668. Bass claims she began to gain weight as a protective strategy against her abusers and she has been obese since childhood. AR 484, 489, 519. She experienced disruption and fighting at school, dropping out during the 11th grade. AR 490, 646, 663. She does not have a GED. AR 663.

### A. Treating Medical Provider Records

#### 1. Physical Impairments

Bass's weight gain led to several related health problems, and she was diagnosed with diabetes and obesity in late 2010, as well as hypertension. AR 395; see also AR 587-87 (primary care provider, West Oakland Health Center, listing her onset date for diabetes and obesity as March 28, 2013, and for hypertension as April 3, 2014). She claims her psychiatric symptoms increased as a result of her worsening health. AR 388. She has visited several providers and examiners for diagnoses and treatment of both her physical and mental ailments.

In March 2013, Bass established care at West Oakland Health Council ("West Oakland"), where she repeatedly saw a nurse practitioner Barbara Turner for her obesity, diabetes, hypertension, joint pain, and depression. AR 516. Up until that point, Bass had attempted to manage her diabetes with emergency room visits and diet and exercise, and self-discontinued her

2

medications because of the side effects. AR 464, 516. During her treatment at West Oakland from 2013 to 2017, Bass variously reported wrist, leg, back, and feet pain, as well as fatigue and weight fluctuations. AR 61 (May 2017), 516 (March 2013), 524 (August 2014), 527-529 (April 2014), 532 (May 2014), 608, 617 (December 2015). Bass also reported that she experienced back pain for many years, AR 617 (December 2015), and difficulty walking due to pain in her feet from neuropathy, which was also diagnosed as early as 2013 as related to her diabetes. AR 608 (December 2015). In May of 2015, Bass complained of experiencing hand and wrist pain, and was diagnosed with carpal tunnel. AR 535, 629-633. In May 2017, Plaintiff reported her hand pain occurs constantly and is worsening. AR 61. NP Turner noted swelling and weakness, and Plaintiff's inability to make a tight grip. *Id.* NP Turner's notes from July 2017 reference an X-ray which was positive for instability and a suggestion to wear wrist supports. AR 35.

Between October 2013 and October 2017, West Oakland Health Center prescribed Bass Enalapril, Hydrochlorothiazide, Amlodipine, Labetalol, Gabapentin, Naproxen, Promethazine, Metformin, Trazodone, and Zoloft, to treat her high blood pressure, pain, diabetes, insomnia, depression, and anxiety. AR 15–16, 25–26, 29–30, 36, 66–67, 520, 525, 528, 533, 538, 542, 546, 550, 582-583, 590–591, 611–615, 620–624, 626, 630, 635, 661. Bass was often "non-compliant" with her medicines (including her medications for diabetes), discontinuing them off and on sometimes due to their side effects, including diarrhea, fatigue, numbness, and flu-like symptoms. AR 79, 464, 516, 524, 594, 606, 625.

### 2. Mental Health Impairments

In April and May 2014 visits to West Oakland, Bass complained of significant sleep problems and insomnia, which NP Turner believed likely arose from her severe depression and anxiety disorder, and was worsened by her caffeine use, stress, and obesity. AR 526, 532, 536. Bass stated that it took her many hours to fall asleep, that she frequently woke up in the middle of the night, and that she is getting only three hours of sleep total in one night. AR 526, 532. In August 2014, she stated that she has felt depressed on and off for most of her life and that she had felt a consistent depression in the preceding two years. AR 489. She only began seeking continuous medical treatment for her mental illness in 2016. Her self-reports and opinion

3

evidence indicate that she was unable to seek consistent treatment for her mental health until 2016 because of her depression, dislike for talking to others, and difficulty trusting others, coupled with a limited insight into the depth and nature of her psychological symptoms and the medical treatment necessary to treat them. AR 68, 553, 665.[1]

NP Turner referred Bass to psychotherapist Marike Seemann, LCSW, and Bass received treatment on March 9, 2016 at West Oakland. AR 603. Seemann stated that Bass was visiting for ongoing depression and anxiety, and that Bass feels like she isolates herself and has some difficulties accepting her part in her relationship issues. AR 602. Seemann described Bass as having "adjustment disorder with mixed disturb of emotions and conduct" but did not make additional recommendations or indicate a need for further evaluations. AR 603.

Bass visited Sausal Creek Outpatient Stabilization Clinic, a drop-in mental health clinic, for her psychiatric conditions on November 28, 2016. AR 638-650. At Sausal Creek, Bass reported experiencing depression, feeling paranoid, fatigue, an inability to eat, lack of motivation, isolating herself, irritability, hopelessness, worthlessness, and feeling easily agitated. AR 639, 649. Sausal Creek's examining psychiatrist observed Bass's depressed mood and flat affect, diagnosed her with Major Depression, assigned her a GAF score of 55,[2] and prescribed her Wellbutrin and Trazadone. AR 641. On December 28, 2016, Bass returned to Sausal Creek, where the examining psychiatrist noted her to be depressed, closed off, and guarded. AR 643.

Through March 2017, she continued to visit West Oakland, and continued to report to NP Turner about her depression, feeling down and anxiety, feelings of hopelessness, lack of motivation, and her minimal interest or pleasure in doing things. AR 674-679. NP Turner noted

---

[1] As noted below, examining physician Ede Thomsen, Ph.D., concluded that Bass has a "history of poor judgement concerning attending psychotherapy and taking her medications consistently and as prescribed. AR 665 (April 2017 report). Specifically finding that Bass "has limited insight into the depth and nature of her psychological conditions/symptoms and the need for on-going medical treatment for her chronic medical conditions." *Id.*

[2] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998). "[A] GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'" *Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014) (quoting Diagnostic and Statistical Manual of Mental Disorders, 4th ed.).

that Bass was refuses "to go to psych – says she will go[]but does not." AR 678. At that point Bass was prescribed Zoloft. *Id*.

**B.     Examining Opinions**

Bass was referred by the SSA for a psychological consultative exam on August 23, 2014 with Dr. Kyle Van Gaasbeek, Psy. D. AR 489. Her chief complaints were related to her depression and diabetes, but she also complained of her unsociability and stated her belief that she is unable to work because "her moods are unpredictable." *Id.* Dr. Van Gaasbeek found that Bass was open, focused, alert, clear and cooperative in speaking, but also moody, dysphoric, and had reduced short term memory function. AR 489-492. Dr. Van Gaasbeek's DSM-IV diagnosis determined Bass has diabetes and obesity, unemployment and financial tightness, major depressive disorder, and assigned her a GAF score of 50. *Id.* He stated that her depression was treatable, though she would be vulnerable to further episodes of depression in the future *Id.*

As a result of his consultation, Dr. Van Gaasbeek concluded that Bass had the following functional limitations:

> The claimant's ability to perform simple and repetitive tasks is unimpaired. Her ability to perform detailed and complex tasks is unimpaired. The claimant's ability to accept instructions from supervisors is unimpaired. Her ability to interact with coworkers and the public is at least moderately impaired. The claimant's ability to perform work activities on a consistent basis without special or additional instruction is unimpaired. The claimant's ability to complete a normal workday without interruptions from a psychiatric condition is moderately substantially impaired. The claimant's ability to deal with the usual stress encountered in the workplace is moderately to substantially impaired.

AR 492.

Bass was referred by social security for a second psychological consultative by Dr. Aparna Dixit, Pys.D on March 23, 2015. AR 556-558. Bass reported pain and balance problems in her knees, blisters on her hands and feet, sleep apnea, high blood pressure, and feelings of unproductivity and irritability. AR 556. She also reported experiencing panic attacks during which she felt dizzy and breathless. *Id.* Dr. Dixit noted that Bass presented with symptoms of depression, and that her mood was dysthymic and her affect was commensurate with her mood. AR 557. Dr. Dixit diagnosed Bass with Depressive Disorder NOS, assigning her a GAF score of

60. AR 558. Dr. Dixit stated that Bass would continue to have mild difficulty in remembering and carrying out complex instructions and dealing with the public, but that she was would have no difficulty interacting with coworkers and supervisors as "she was cooperative and pleasant" during the examination, that she was oriented, and that she had adequate insight and judgment. AR 557, 558.

Bass was also referred by the SSA to an internal medicine consultative exam on March 23, 2015, with Dr. Farah Rana, M.D. AR 553-555. Bass reported experiencing long-standing depression for which she had never seen a psychiatrist or been treated. AR 553. Dr. Rana stated that Bass "presents with a history of Diabetes type 2, history of hypertension, morbid obesity, and reported history of depression" as her initial diagnostic impression. AR 554–555. She concluded that that Bass was limited to medium work in a functional capacity assessment, including the ability to stand and walk for six hours out of eight-hour days (with breaks), and carry 25 pounds frequently and 50 pounds occasionally. AR 554-555.

Bass was referred by Bay Area Legal Aid for a psychological evaluation with Dr. Ede Thomsen, Ph.D., in April 2017. AR 662-673. Dr. Thomsen performed a clinical interview, psychological tests, and reviewed Bass's treatment records from March 28, 2013, through January 17, 2017. AR 665. Bass reported her anxieties, insomnia, and several other psychological ailments. AR 665, 667, 668. Dr. Thomsen observed Bass's depressed and anxious mood, with restricted affect. AR 664. Dr. Thomsen opined that Bass's psychiatric symptoms make it difficult for her to have consistent social supports as she isolates from others, has great difficulty trusting others, and is prone to feelings of paranoia, as shown in her medical records. AR 664. Dr. Thomsen stated that Bass evidenced memory impairment, and that her symptoms and ailments were exacerbated by a limited insight into the depth and nature of her psychological conditions and the need for ongoing medical treatment for her chronic medical conditions, poor judgment concerning attending psychotherapy and taking her medications consistently and as prescribed, and poor reasoning and problem solving abilities. AR 665, 668.

Dr. Thomsen also found Bass has severe deficits in emotional functioning caused by her severe depression, anxiety, and PTSD. AR 667-668. She concluded that Bass experiences

difficulty effectively taking in, processing, and organizing information, adhering to/remembering work-like procedures and sustaining an ordinary routine, dealing with typical work stress effectively, working in collaboration with others or in close proximity to others or with customers, and adapting/responding to changes in a work setting. AR 669.

### C. Self-Reports

At her hearing with the ALJ, Bass testified that she experiences fatigue and has to rest throughout the day. AR 80. Bass also testified that she tries to clean her apartment but must stop because she lacks the energy and motivation to continue. AR 80, 81, 85. She testified that she experiences pain which limit her ability to sit, stand, and use her hands. AR 79-80. Bass reported that she does not often leave the house if alone, other than to go to the corner store. AR 85. However, Bass does leave the house almost every day with her mother to run errands, who picks her up to get her out of the house. *Id.* Bass reported that that there are times that she does not even have the energy to get dressed, that she often does not cook, but rather microwaves finger foods, and that she shops "maybe 3 times a month on a good month." AR 85, 341, 342.

Bass testified and has consistently reported that she cannot remember to follow through with medical appointments and that she often has problems remembering to take all of her medication. AR 35, 81-82, 87, 88. She has also consistently testified to and reported feeling isolating, paranoia, and difficulty getting along with and trusting others. AR 84, 346, 489–490, 553, 639, 663–665, 669.

Bass has only held two jobs. She was a warehouse worker from 1996 to 1999, and then she was an in-home caretaker for her grandmother from 2002 to 2010. AR 286, 376. She stopped her caretaker role around the time she was diagnosed with diabetes; that condition caused several health complications and hospitalizations and she was unable to care for her grandmother (who died in 2013). AR 489.

## III. ALJ DECISION

The ALJ utilized the five-step sequential evaluation to determine Bass's disability claim. AR 43. At step one, the ALJ found that Bass met the insured status requirements of the Social Security Act through June 30, 2015. AR 44. Bass has not engaged in substantial gainful activity

since her amended alleged onset date, November 9, 2010. *Id.* At step two, the ALJ found that Bass suffers from the following severe impairments: obesity, Carpel Tunnel Syndrome, depressive disorder, and PTSD. *Id.* The ALJ did not identify Bass's diabetes or her hypertension as severe impairments because "the record reflects" that those conditions "are without complications, asymptomatic, and have caused no end organ damage or strokes." *Id.* The ALJ further explained Bass's diabetes was not considered severe because Bass was not compliant with her medications, refused to take educational diabetes classes, and preferred to control her diabetes with only exercise and emergency room visits. *Id.*

At step three, the ALJ concluded that Bass did not have an impairment or combination of impairments that met or equaled a listed impairment in 20 C.F.R Part 404, Subpart P, Appendix 1. AR 45. The ALJ specifically considered whether the claimant's obesity might alone be equivalent in severity to a listed condition, or if it could be combined with other impairments to meet a listing. AR 45. However, the ALJ relied on evidence that he believed showed that Bass is able to engage in various daily activities such as driving a car, shopping in stores, working in a hair salon, living on her own, and completing household chores, to conclude that her obesity did not cause limitations alone or in combination with her other impairments that reached the "listing-level significance." *Id.*

The ALJ also contends that Bass's mental impairments do meet or equal a listing under the "paragraph B" criteria, either alone or in combination with each other. AR 46. The ALJ concluded that Bass has some moderate and mild limitations, but none rose to the level of a listed impairment alone or in combination. In reaching that conclusion, the ALJ again cited evidence of Bass's daily activities (noting, in addition to the evidence of activities and abilities above, she also spends time with others playing cards and dominoes, spends time on the phone, she is able to drive a car, she is able to go out alone, and she goes out almost every day with her mother) as well. AR 46-47. Finally, the ALJ concluded that because Bass has not received "continuous, intensive mental health treatment", she does not meet the "paragraph C" criteria. AR 47.

The ALJ then determined that Bass retained the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R § 404.1567(c) and § 416.967(c) with the following

limitations:

> Lift and carry 50 pounds occasionally and 25 pounds frequently; sit, stand, and/or walk for 6 hours each in an 8-hour workday; occasional fingering bilaterally; frequent climbing of ramps, stairs, ladders, ropes, and scaffolds; frequent stooping, kneeling, crouching, and crawling; limited to performing simple, routine tasks; limited to performing simple work-related decisions; and could occasionally interact with the public.

AR 48.

The ALJ first discounted Bass's reported limitations as inconsistent with the medical record. AR 48–49. He found that given the very conservative and sporadic treatment for her physical conditions from NP Turner, Bass's characterization as to the severity of physical pain and limitations were not supported. AR 48. The ALJ's characterized Bass's examination and consultation records for her physical conditions (her diabetes, obesity, sleep apnea, high blood pressure, blisters, CTS, and joint pain) as showing mostly normal or unremarkable results. AR 48-49.

With respect to her mental health impairments, the ALJ characterized her treatment as "minimal and rather new," point out that as of March 2015 she denied any hospitalization from or treatment of her mental complaints. AR 49. Taken together, the ALJ determined that Bass's treatment records "suggest that her mental complaints are not as continuous and limiting as alleged." *Id*.

The ALJ concluded that although her impairments could reasonably be expected to cause the alleged symptoms, Bass's statements and those of her friend Brandon Thompson concerning intensity, persistence, and limiting effects are "not entirely consistent with the medical and other evidence in the record and are consequently assigned little weight." *Id*. The ALJ further found that the evidence regarding Bass's daily life activities were not consistent with someone who alleges disabling pain and depression, and some of her conditions may be more "situational, and not medical, in nature." *Id*.

Turning to what limitations Bass had on her ability to work as supported by the opinion evidence, the ALJ assigned great weight to the internal medicine consultative exam of Dr. Farah M. Rana, M.D. and the psychological consultative examination of Aparna Dixit, Psy. D. AR 50.

He assigned significant weight to the psychiatrist consultative examination of Kyle Van Gaasbeek, Psy. D, except the ALJ rejected Gaasbeek's assignment of a GAF score of 50 as inconsistent with the longitudinal record as a whole. *Id*. Though rejecting Dr. Van Gaasbeek's GAF score as inconsistent with the longitudinal record, the ALJ explained that his "RFC assessment sufficiently accounts for the moderate impairments Dr. Van Gaasbeek identified in light of the Plaintiff's medical records and her activities of daily living." AR 50. The ALJ also assigned little weight to the GAF score of 55 given by the examining psychiatrist at Sausal Creek, contending it was not based on a long treating relationship or accompanied by any explanation. *Id.*[3]

Finally, the ALJ assigned little weight to the April 19. 2017 opinion of Ede Thomsen, Ph.D., who assigned Bass a GAF score of 46 and opined that Bass had "marked limitations" in interacting appropriately with the public, and has marked and extreme impairments in many areas. AR 51-52. The ALJ's justified giving reduced weight to Dr. Thomsen because Thomsen's restrictive opinions were "overly reliant" on self-reports from Bass which are "not consistent with the evidence as a whole," were not based on a treating relationship, and were not consistent with the medical records as a whole. AR 51. For example, the ALJ noted that Bass informed Thomsen that she "really [doesn't] go anywhere because I really don't like to be around people," but that statement was at odds with her self-reports that she often spends time with other playing cards and goes shopping in stores, and was inconsistent with her hearing testimony that she goes out almost every day with her mother. AR 52.

At Step Five, the ALJ found that Bass was not disabled pursuant to the Medical Vocational Guidelines because she could perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) with the moderate limitations from her RFC. Based on this RFC, the ALJ found that Bass could not perform past relevant work but that there are jobs that exist in significant numbers in the national economy that Bass can perform. AR 52-53.

---

[3] The ALJ also assigned reduced weight to a number of opinions of non-examining sources, including State agency medical consultants Drs. J.R. Saphir, M.D. (2014), A. Nasrabadi, M.D. (2015), Patrice G. Solomon, Ph.D. (2014), and E. Aquino-Caro, M.D. (2015). AR 50-51. Each of those opinions found Bass to be less limited than the ALJ concluded she was.

**LEGAL STANDARD**

**I.     DISABILITY DETERMINATION**

A claimant is "disabled" as defined by the Social Security Act if they are (1) "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 1382c(a)(3)(A)-(B); *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012). To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the first two steps of the evaluation, the claimant must establish that he or she (1) is not performing substantial gainful activity, and (2) is under a "severe" impairment. *Id.* § 416.920(a)(4)(i)-(ii). An impairment must have lasted or be expected to last 12 months in order to be considered severe. *Id.* § 416.909. In the third step, the claimant must establish that his or her impairment meets or medically equals a listed impairment described in the administrative regulations. *Id.* § 416.920(a)(4)(iii). If the claimant's impairment does not meet or equal one of the listed impairments, before proceeding to the fourth step, the ALJ is to make a residual functional capacity determination based on all the evidence in the record; this determination is used to evaluate the claimant's work capacity for steps four and five. *Id.* § 416.920(e). In step four, the claimant must establish that his or her impairment prevents the claimant from performing relevant work he or she did in the past. *Id.* § 416.920(a)(4)(iv). The claimant bears the burden to prove steps one through four, as "at all times, the burden is on the claimant to establish [his] entitlement to disability insurance benefits." *Id.* (alterations in original). Once the claimant has established this prima facie case, the burden shifts to the Commissioner to show at the fifth step that the claimant is able to do other work, and that there are a significant number of jobs in the national economy that the claimant can do. *Id.* §§416.920(a)(4)(v),(g); 416.960(c).

## II. STANDARD OF REVIEW

Under 42 U.S.C. §405(g), the court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and free of legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *DeLorme v. Sullivan*, 324 F.2d 841, 846 (9th Cr. 1991) (ALJ's disability determination must be supported by substantial evidence and based on the proper legal standards). Substantial evidence means "more than a mere scintilla,' but less than a preponderance." *Saelee v. Chater*, 94 F.3d 520, 521-22 (9th Cir. 1996) *quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (internal quotation marks and citation omitted).

The court must review the record as a whole and consider adverse as well as supporting evidence. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Robbins*, 466 F.3d at 882 (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)); *see also Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

## DISCUSSION

Bass argues that the ALJ erred by: (i) not including diabetes among her severe impairments at Step Two of their disability analysis; (ii) improperly rejecting opinions of her treating and examining sources without clear and convincing or specific and legitimate reasons; (iii) failing to properly consider her obesity throughout the analysis; (iv) not providing clear and convincing reasons for rejecting her subjective statements; (v) using an RFC that was not supported by substantial evidence; and (vi) improperly relying on the Medical Vocational Guidelines despite her mental health limitations. The Commissioner opposes and moves for summary judgment, arguing that the ALJ's decision was adequately supported by substantial evidence.

## I. STEP TWO ANALYSIS

Bass first challenges the ALJ's Step Two determination that her diabetes was not a severe impairment. She argues that by failing to consider her diabetes as severe, and to consider her limitations from diabetes in combination with her obesity, the ALJ effectively ignored the resulting symptoms that impacted Bass's ability to work: "fatigue, pain in her legs, feet and back, diabetic neuropathy, joint pain throughout her body, insomnia, and blisters on her hands and feet." Pls Mot. at 10. Plaintiff points to her testimony in the record supporting that her fatigue, lack of strength, and pain (resulting from her diabetes combined with her obesity) limit her ability to sit and stand and perform daily life functions, and, therefore her ability to function in the workplace. *Id*. at 10-11.

The Commissioner responds that any failure to characterize diabetes as severe was immaterial to the outcome of this case, as the ALJ properly considered all of plaintiffs' medically-determinable limitations from any source in determining Bass's RFC. A mere failure of an ALJ to identify a condition as "severe" is not itself erroneous when the ALJ properly considers the limitations that flow from that condition in setting the RFC. *See Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) ("The RFC therefore should be exactly the same regardless of whether certain impairments are considered 'severe' or not. Here, all impairments were taken into account both times."). Therefore, as long as the ALJ considered all of Bass's impairments and the limitations that could be reasonably caused by those impairments, the failure to include diabetes as a severe impairment at Step Two was harmless. *Compare Buck*, 869 F.3d at 1049 with *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (ALJ erred when he "ignored substantial and undisputed evidence of Smolen's other impairments and failed to consider how the combination of those impairments affected Smolen's ability to do basic work activities.").

Here, the ALJ *did consider* Bass's complaints of pain, fatigue, insomnia, and blisters that Bass contends result from her diabetes and obesity. AR 44-45. When addressing obesity specifically, the ALJ noted that it did not rise to the level of a listing impairment because of the evidence in the record of Bass's daily life activities indicated she could drive, go shopping, work in a hair salon, live on her own, and complete household chores (although Bass argues the ALJ

13

overstated the frequency, duration, and circumstances of these activities). The ALJ considered the insomnia as part of Bass's severe depression and PTSD. AR 44. When establishing the RFC, the ALJ again concluded that the "medical record is not consistent with [Bass's] reported limitations and symptoms" stemming from her physical impairments because Bass has received "very conservative, sporadic treatment from a nurse practitioner and has not been referred to any specialist for her obesity or CTS," or for any of her other physical impairments. AR 48. Whether the ALJ erred in considering Bass's treatments for her physical impairments as conservative and her limitations as inconsistent with her daily life activities will be addressed below.[4]

Even if the ALJ erred in failing to include diabetes at Step Two as a severe impairment, any error was harmless because the ALJ did consider and address *the symptoms and limitations* Bass attributed to her diabetes in combination with obesity.

## II. FAILURE TO CONSIDER OBESITY

Somewhat similarly, Bass asserts that the ALJ erred in failing to properly consider the limitations caused by her obesity "throughout" the sequential disability analysis. Mot. at 17-18. As noted above, the ALJ did consider the evidence regarding Bass's treatments at West Oakland for her complaints that could reasonably have been caused by obesity (including hypertension and pain). In doing so, the ALJ considered the sporadic and conservative treatments Bass *had received* at West Oakland, and the lack of referrals to any specialists (other than for CTS and her mental health issues).

Bass alleges that the ALJ failed to consider medical records diagnosing her as morbidly obese, citing only one record (AR 517, showing a BMI of 49.2), and contends that the ALJ erred because the "record indicates that Plaintiff's obesity exacerbated her other impairments, the ALJ's analysis is not sufficient." Pls. Mot. at 18. But Bass cites no evidence of functional limitations due to her obesity that "would have impacted the ALJ's analysis" that the ALJ did not consider.

---

[4] Bass criticizes the Commissioner for pointing to "outdated" evidence that her physical examinations were unremarkable. Reply at 6. But she does not point to any medical treatment records, tests, or opinion evidence substantiating her claims that her pain or fatigue resulting from her diabetes and obesity *are* substantially limiting despite treatment, much less that such evidence was ignored or mischaracterized by the ALJ.

14

*Compare Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) (rejecting error where, "[e]ven on appeal, Burch has not pointed to any evidence of functional limitations due to obesity which would have impacted the ALJ's analysis. In fact, the only evidence in the record relating to her obesity are notes from doctors who observed weight gain, indicated that Burch is obese, and recommended that she participate in a medically supervised weight loss program."); *with Celaya v. Halter*, 332 F.3d 1177, 1182 (9th Cir. 2003) ("The ALJ was responsible for determining the effect of Celaya's obesity upon her other impairments, and its effect on her ability to work and general health, given the presence of those impairments. Defendant admits that the ALJ did not do so, even implicitly.").

The ALJ considered Bass's complaints of pain, fatigue and other symptoms that could reasonably be caused by her obesity (in or not in connection to her diabetes) and concluded that her treatments for those symptoms were conservative and sporadic. She cites no evidence, other than subjective complaints, that indicate functional limitations related to her obesity that the ALJ should have considered but did not.

### III.  TREATING AND EXAMINING SOURCE OPINIONS

Bass argues that ALJ improperly dismissed and gave reduced weight to the findings and limitations of her treating and the examining sources, including, Dr. Kyle Van Gaasbeek, Psy. D, Ede Thomsen, Ph.D, the psychiatrist at Sausal Creek, and her medical providers at West Oakland Health Council. The Commissioner contends that the ALJ's findings are supported by substantial evidence and that proper weight and evaluation were given to the findings of those sources.

#### A.  WEST OAKLAND HEALTH CENTER

Bass contends that the ALJ "improperly and implicitly" rejected the "opinions" of her "treatment team" at West Oakland Health Center. Indeed, the only time the ALJ specifically noted Bass's records from West Oakland was when the ALJ noted that Bass had only received conservative and sporadic treatment for her diagnosed conditions (including diabetes, hypertension, pain, blisters and rashes) at West Oakland. AR 48.

But as noted above, the ALJ did consider Bass's treatment records. Nowhere in those treatment records are any opinions (from NP Turner other anyone else) about how the symptoms

15

for which she received treatment limited Bass's daily life activities or ability to work. Other than citing to portions of the West Oakland treatment records that show what is undisputed – that Bass complained of and sought treatment for her diabetes, hypertension, pain, fatigue, insomnia, and other medical issues – she does not point to any opinion evidence or medical records that were ignored or mischaracterized by the ALJ. The ALJ did not err with respect to the West Oakland records.

### B. DR. VAN GAASBEEK

Bass asserts that the ALJ implicitly rejected key portions of Dr. Van Gaasbeek's opinion, despite purporting to give them "great weight," by failing to account for the limitations Gaasbeek found in the ALJ's RFC. Gaasbeek concluded that Bass's "ability to interact with coworkers and the public is at least moderately impaired," her "ability to maintain regular attendance in the workplace is moderately impaired," her "ability to complete a normal workday without interruptions from a psychiatric condition is moderately [to] substantially impaired," and her ability "to deal with the usual stress encountered in the workplace is moderately to substantially impaired." AR 492. The ALJ assigned significant weight to Gaasbeek's opinions, but found that the RFC "sufficiently accounts for the moderate impairments" found by Gaasbeek "in light of the claimant's medical records and her activities of daily living." AR 50.

The Commissioner argues that the ALJ did not err because the ALJ's RFC finding for "simple, routine and unskilled work with only occasional interaction with the public accommodated those limitations." Cross-Mot. at 4. The Commissioner points out that unskilled work, deals primarily with objects rather than people and that in *Hoopai v. Astrue*, 499 F.3d 1071, 1077 (9th Cir. 2007), the court affirmed an ALJ decision that, despite finding "moderate" limitations in a claimant's "ability to complete a normal workday and workweek without interruption from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," the claimant could nonetheless perform various low skilled jobs. *Id*. at 1075-77.

In *Hoopai*, the "functional limitations of the claimant's depression on his activities of daily living and maintaining social functioning were mild," while the "limitations were moderate on his

16

ability to maintain concentration, persistence and pace." *Hoopai*, 499 F.3d at 1077. Here, however, Gaasbeek found "moderate to severe" limitations (not just moderate ones) in at least two functional categories (the ability to complete a normal workday without interruptions from a psychiatric condition and the ability to deal with the usual stress encountered in the workplace). The distinguishing factors in *Hoopai* are not present. It does not appear that the ALJ adequately took into account all of Gaasbeek's moderate to severe limitations in the RFC despite the claim that he did.[5] The ALJ, erred in failing to address the moderate to severe limitations assessed by Gaasbeek that were accepted and not disputed by the ALJ.[6]

### C.  EDE THOMSEN, PH.D

Bass also asserts that the ALJ erred by "affording little weight" to the opinion of consulting examiner Dr. Ede Thomsen. Thomsen evaluated Bass in April 2017, ran diagnostic tests, and reviewed her medical records. AR 662-670. Thomsen concluded that Bass's activities of daily living were "severely compromised" based on self-reports by Bass but also on information gleaned from the medical records (in particular, information regarding Bass's inability to stay compliant with her medications and appointments), has poor judgment, and difficulty processing and organizing information. AR 668-669. Thomsen opined that Bass would have serve limitations in social functioning; moderate limitations with judgment/insight; marked limitations in interacting with the public, accepting instructions, and responding appropriately to changes in a normal work day; and extreme limitations in her ability to complete a normal work day or week without interruptions from psychologically based symptoms and in maintaining regular attendance at work. AR 672-73.

---

[5] Bass also challenges the ALJ's reliance on the vocational "grids" instead of on the testimony from the vocational expert at the hearing, arguing that the grids fail to address the "moderate to severe" limitations found by Gaasbeek that were not disputed by the ALJ. Because the ALJ failed to adequately address or account for the Gaasbeek limitations, I do not separately address the ALJ's reliance on the grids.

[6] In her opening brief, but not addressed further in Reply, Bass contends that the ALJ erred in assigning "little weight" to the 55 GAF score assessed by an "illegible psychiatrist" at Sausal Creek Outpatient Stabilization Clinic, because that assessment was not based on a long treating relationship or accompanied by any explanation. AR 51; Pls Mot. at 16-17. Bass does not explain how this rejection was either erroneous or otherwise impacted the ALJ's RFC or other determinations during the sequential analysis.

17

The ALJ discounted Thomsen's conclusions because they were overly-reliant on Bass's self-reports, not based on a treating relationship, and not consistent with the record as a whole considering Bass's self-reports to the Administration about her daily life activities.

The Ninth Circuit has held that, given the nature of psychiatry, "[d]iagnoses will always depend in part on the patient's self-report," and that "the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). Therefore, in this context, a psychiatrist's reliance on self-reported symptoms is not a sufficient reason to reject his or her opinion. *Id.* Here too, part of Thomsen's opinions were based on Bass's self-reports, but they were supported by Thomsen's other clinical assessments and based, in part, on a review of Bass's treatment records.

At base, the ALJ discounted Thomsen's opinions of Bass's limitations because the ALJ believed that Bass had repeatedly admitted to the Social Security Administration and in the ALJ hearing that she had greater functional capacity in terms of dealing with the public than Bass admitted to Thomsen. The ALJ noted that Bass told the ALJ that "often spends time with others playing cards," goes shopping in stores, and runs errands with her mother almost every day, as opposed to rarely wanting to be around people and not feeling up to running errands. AR 52. However, the ALJ ignored that Bass has consistently reported she has difficulty being around people, isolates herself, and generally only goes places when she has to and with her mother (unless it is the corner store). AR 84, 85, 342-343, 489, 490, 553. Bass further points out that the ALJ mischaracterized her daily activities. For example, the ALJ wrote that Bass "often" spends time with others playing cards and dominoes. In fact, she reported doing this only once a week and it is unclear with whom (AR 343), and that while she goes out almost every day with her mother to run errands, that is only because her mother forces her to run errands with her. AR 85.

The ALJ's discounting of Thomsen's opinions and limitations, in significant part by mischaracterizing the frequency and significant of Bass's admitted daily life activities, was erroneous.

## CONCLUSION

Because I have found that the ALJ erred in the treatment of the Gaasbeek and Thomsen

opinions, in significant part by mischaracterizing some of the evidence of Bass's daily life activities, the matter will be remanded. I do not need to reach whether the ALJ also erred in discounting Bass's other subjective statements, determining the RFC, and ignoring the vocational expert testimony in favor of the grids. Those arguments, however, have some merit given the ALJ's failures identified in this Order. However, because the merits of this case will not be clear until the ALJ properly weighs and considers the opinions of Gaasbeek and Thomsen and whether Bass's more consistent treatment of her mental health impairments might diminish her limitations, remand is necessary.

For the reasons above, I GRANT Bass' motion for summary judgement, DENY defendant's motion for summary judgment, and REMAND the case for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: September 30, 2019

William H. Orrick
United States District Judge